THE PEOPLE OF PUERTO RICO, Plaintiff and Appellee, *v.* JULIO PACHECO PADILLA, Defendant and Appellant.

No. CR-65-164.     Decided December 9, 1965.

*Elí B. Arroyo* for appellant. *J. B. Fernández Badillo, Solicitor General,* and *J. F. Rodríguez Rivera, Assistant Solicitor General,* for The People.

MR. JUSTICE DÁVILA delivered the opinion of the Court.

Appellant was charged with lying with a young girl who was a few months short of her fourteenth birthday. In support of the information the district attorney presented the evidence recited below. The first witness testified that on December 6, 1963, he saw the young girl alleged to have been raped "handing through a window a small piece of paper which she had in her hands to this man here." The district attorney asked, "To this man?," and the answer was, "Yes."[1] The second witness testified that defendant asked him to take him in his car to Aguadilla. Then "we reached a certain place, a bar in San Sebastián, and we stopped and stayed for a while, and shortly afterwards he left and returned with a girl; then they got in the car and I brought them; he said to me 'take me to Aguadilla.' " On the way to Aguadilla defendant told him to drive by way of the detour. "I drove in that direction and when we arrived at the Magic Lamp he asked me to drop him there." He testified that he dropped the defendant and the girl in front of the Magic Lamp, on the road. The district attorney asked him "have you seen this girl here in court today," and he answered "Yes, I saw her there." The district attorney commented, "Your Honor, subject to further identification; we are through with the witness."

The presumptive prosecutrix testified that she was thirteen years of age (she was four months short of her fourteenth birthday); that on December 6 defendant rented a car from a friend whom she identified among the public, pointing to a person who was wearing a lavender shirt, to take them to the Magic Lamp motel; that when they arrived at the motel defendant went into the bar and spoke with a woman; afterwards he returned to the car to get her and took her to the motel, to room No. 2; and "Since in the Magic

---

[1] Presumably he refers to defendant, but there is no positive indication that he is. The record does not disclose that he pointed to defendant.

Lamp motel there is a juke box against the wall, we put on records and started to dance"; then "we went to bed and had sexual intercourse, several times." They stayed three days in the motel; from there they went to another hotel in Arecibo where they stayed two days. Finally the defendant took her to her father's house[2] in Hormigueros.

Dr. Francisco A. Márquez examined the prosecutrix the day of the trial, May 13, 1964, and testified that she was not virgin and that the defloration had taken place more than 10 days ago.

The prosecutrix's foster father testified that the young girl disappeared on the evening of December 6 and he did not see her again until the 14th when defendant informed that she was in Mayagüez. He also testified that two or three days after she had disappeared he went to Ramey Base where defendant was working in order to ask him where she was, and that the latter answered that if it had not been for the fuss which he made he would have told him where she was.

The mother testified that she saw defendant on December 6 around her house, in a store; that about 7:30 of that evening she went out to take dinner to her husband and did not find her daughter upon her return. She saw her again in court at the time of the investigation. She testified that on another occasion prior to that day her daughter had disappeared with another man.

On cross-examination of the prosecutrix the defense attorney asked: "What did you do there in the Magic Lamp, what do you mean by sexual intercourse, tell me?" The attorney asked this question because on direct examination the prosecutrix merely said that she had sexual intercourse with the defendant. When the question was asked, the judge intervened and said the following: "Will you explain, baby,

---

[2] The prosecutrix lives in San Sebastián with her mother who is married for the second time.

tell me, look, listen to me. Can you explain, can you answer yes or no?," to which the young girl answered "I do not dare." The judge then decided not to allow further cross-examination. The defense objected.

■ While it is true that as a rule the statement of having had sexual intercourse establishes that fact because it is known what it means, *People* v. *Colón*, 81 P.R.R. 788 (1960); *State* v. *Moorer*, 129 S.E.2d 330 (S.C. 1963); *State* v. *Waters*, 135 N.W.2d 768 (Wis. 1965), if the defense insists on cross-examining in order that it be explained, it is error to prevent it.

■ The right to cross-examine a witness is fundamental for a fair and impartial trial. It is sanctioned in § 11 of the Bill of Rights of our Constitution in providing that the accused shall enjoy the right "to be confronted with the witnesses against him." It is the means available to the defense to discover the truth. To deprive him of that right in connection with one of the principal elements in the commission of an offense is reversible error. Completion of the sexual act is the principal element of the offense charged to appellant. Not to permit the defense to delve into that aspect in order to determine whether the act was actually completed prejudiced the defendant.

The Supreme Court of California in *People* v. *Howard*, 76 Pac. 1116 (1904), stated as follows in reversing a rape case on the ground of refusal to permit cross-examination of the prosecutrix in connection with her age:

". . . The power of cross-examination is one of the most efficacious tests which is known to the law for the discovery of truth. To deprive the defendant of this right in a proper case, and in regard to material matter, and when the cross-examination is confined within the general scope of the direct examination, is error for which a judgment of conviction should be reversed. It is always proper to cross-examine a witness fully as to all facts and circumstances connected with the matter stated in his direct examination."

In *People* v. *Boardman*, 205 Pac. 877 (Cal. 1922), the situation was similar to that in the present case and the judgment was reversed on appeal. See, also, *People* v. *Swanson*, 22 Cal. Rptr. 178, 181 (1962).

Recently the Supreme Court of the United States stated in *Pointer* v. *Texas*, 380 U.S. 400 (1965):

". . . We hold today that the Sixth Amendment's right of an accused to confront the witnesses against him is likewise a fundamental right and is made obligatory on the States by the Fourteenth Amendment.

"It cannot seriously be doubted at this late date that the right of cross-examination is included in the right of an accused in a criminal case to confront the witnesses against him. And probably no one, certainly no one experienced in the trial of lawsuits, would deny the value of cross-examination in exposing falsehood and bringing out the truth in the trial of a criminal case. . . . The fact that this right appears in the Sixth Amendment of our Bill of Rights reflects the belief of the Framers of those liberties and safeguards that confrontation was a fundamental right essential to a fair trial in a criminal prosecution. Moreover, the decisions of this Court and other courts throughout the years have constantly emphasized the necessity for cross-examination as a protection for defendants in criminal cases."

■ The judge also erred in instructing the jury. Let us see. One of the prosecution witnesses, the prosecutrix's stepfather, testified that appellant had told him two or three days after the prosecutrix had disappeared that if "it had not been for all the fuss made . . . I would have told him where the girl was." Referring to these statements, the judge instructed the jury as follows:

"Those statements which the witness claims were made to him by defendant perhaps could be considered as an admission, and those admissions are admissible in evidence if they were not obtained by threat or promise but were voluntarily made, without coercion of any kind, and it is what in law is meant by admissions or statements in regard to a matter. We cannot

define it as a confession because a confession in criminal law is an admission or a statement made by a person that he is guilty of the offense charged. Admission is distinguished from confession by the fact that the term 'admission' in criminal law refers to a specific fact which might be specific or isolated, or both terms jointly, tending to establish the guilt or some element of the offense, while confession is broader. It is the full acknowledgment of the guilt. Confession is the full acknowledgment of the guilt. Admission, I repeat, refers to some specific fact tending to establish the guilt or some element of the offense. Of course, in considering this which we would term as statements made by the defendant to this witness, you must consider, first, whether you really believe that those admissions were actually made, and then whether you believe that that corroborates the prosecutrix's testimony. It means that the case will not be decided only on what the prosecutrix said, but that you are going to decide whether the rest of the other evidence is sufficient to believe everything the prosecutrix says. If it is sufficient to give credit to everything the prosecutrix says, and that is important and essential, then you say, well, we believe this girl because we also believe the other witness who first said that he dropped her at that place. We also believe this girl because we believe the witness, who testified that defendant said that he would not say where she was because of that circumstance, and because afterwards defendant referred to the place where the girl was."

In nowise can it be sustained that those statements made by appellant constitute an admission of the offense of rape charged. The judge also instructed the jury in the sense that those statements may constitute the required corroboration of the prosecutrix's testimony. This, clearly, was error. See *People* v. *Crespo Guerrero*, 90 P.R.R. 212 (1964).

In view of the foregoing, we need not consider the other grounds adduced urging reversal of the judgment appealed from. The judgment rendered by the Superior Court, Aguadilla Part, will be reversed and the case remanded for new trial.