Filed 7/18/25  P. v. Pennings CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

THE PEOPLE,

    Plaintiff and Respondent,

     v.

OTONIEL TYLER PENNINGS,

    Defendant and Appellant.

D082825

(Super. Ct. No. SCD291563)

APPEAL from a judgment of the Superior Court of San Diego County, Melinda J. Lasater, Judge.  Affirmed.

John L. Staley, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Daniel Rogers and Matthew Mulford, Deputy Attorneys General, for Plaintiff and Respondent.

Otoniel Tyler Pennings appeals from a judgment following convictions on one count of false imprisonment, one count of unlawfully taking a vehicle, and one count of receiving a stolen vehicle.  He contends the convictions should be reversed because the trial court erred in striking certain portions of

his testimony.  The Attorney General disagrees, and so do we.  Thus we affirm the conviction.

## I.
## Background

This case arises from a set of events that occurred one summer evening after Pennings approached a motorist working on his car by the side of a road.  Pennings and the motorist found it difficult to communicate with one another because the motorist spoke Spanish but not much English, and Pennings spoke English but not much Spanish.  But, using the speaker function on his cell phone, Pennings partly overcame the language gap by introducing into the mix a bilingual friend with whom he was speaking over the phone.

After speaking with Pennings's friend over the phone and after resolving the problems he had been experiencing with his car, the motorist agreed to give Pennings a ride.  Pennings then entered the front passenger seat of the car, and, guided by Pennings's friend over the phone, the motorist drove Pennings to the friend's home.  Not long after, the friend entered the back seat of the car and the motorist began driving both strangers—Pennings and his friend—until, at the direction of Pennings or the friend, the motorist pulled over and switched seats with the friend.  Thereafter, the friend drove the car to another location, where the motorist exited the car and watched as it was driven away.

After the car had been driven away, the motorist dialed 911 and reported it stolen.  A few days later Pennings was arrested in possession of the car.  Thereafter, he was charged with one count each of kidnapping, carjacking, kidnapping during a carjacking, unlawfully taking a vehicle, and receiving a stolen vehicle.

2

At trial the motorist testified that he had not been parted from the car voluntarily. According to his testimony, when Pennings approached him on the street, he observed that Pennings "was a bald cholo all tattooed," including with what he understood to be gang-related tattoos "on his forehead and on his neck." Pennings "showed [the motorist] a knife in the pocket of his sweats," he told the motorist (through the friend on the phone) "that he had just gotten out of jail two days ago," and he "got upset" when the motorist initially declined his request for a ride.

The motorist further testified that he ultimately agreed to give Pennings a ride because he feared for his safety. In addition, he felt "uncomfortable" during the encounter because Pennings's demeanor was "angry" and "aggressive," and because he (the motorist) felt as though he "couldn't do anything." When the motorist told Pennings several times after they had arrived at the friend's house that he wanted to leave, Pennings pulled the keys from the ignition. When Pennings and his friend later induced the motorist to exit the car and left him by the side of the road, they mocked him through the car window as they drove away.

Pennings, by contrast, described the evening's events as consensual. He acknowledged during his testimony that he had been affiliated with a local gang for about 19 years. He further testified that, at the time of the initial encounter with the motorist, he had been feeling vulnerable because his visible tattoos made him potential prey for a pair of potential rival gang members who he had observed patrolling the neighborhood. It was for this reason that he had requested a ride. He denied having possessed, let alone displayed, a knife; and he denied having deprived or attempted to deprive the motorist of the car keys. In fact, the encounter as Pennings described it was

3

mostly convivial—so much so that it involved the three men drinking alcohol and smoking methamphetamine together.

Explaining the change in possession of the car, Pennings testified that—based on unspecified statements his friend had made to him that evening—he had understood that the friend and the motorist had been negotiating some sort of transaction involving the car and that the motorist had *agreed* to be parted from the car.[1]  When asked why he had not referred to his friend by name, Pennings expressed a concern, rooted in gang culture, that revealing the identity of his friend could endanger his loved ones and himself.  Then, during cross-examination, he repeatedly refused to identify the friend—including after the court had ordered him to do so.

The prosecution responded to Pennings's refusal to disclose his friend's identity by asking the court "to strike [Pennings's] entire testimony and to strike defense counsel's opening statement"; and the court and counsel discussed the matter at length outside the presence of the jury.  In these discussions, the court expressed "sympathy for [Pennings's] dilemma, assuming that he's accurate in what he's saying."  But it also made a finding

---

[1]    For example, Pennings testified as follows:

"Q. Based off of the story your friend told you, did you believe he had possession of the PT Cruiser with permission from [the motorist]?

"A. Yes.

"Q. Based off of what your friend told you, was it your understanding that there was some sort of transaction between [the motorist] and your friend . . . [f]or the PT Cruiser?

"A. Yes.

"Q. [D]id you ever believe that the PT Cruiser was stolen?

"A. At that time, no."

that the information Pennings was refusing to disclose was material, and it discussed with counsel the options for moving forward under the circumstances. Among the options the court considered: declaring a mistrial, which the court described as "the most extreme" option; striking all of Pennings's testimony, which the court characterized as "the second most" extreme option; and two other measures that the court ultimately implemented.

The first of the two measures the court implemented was a ruling striking a portion of Pennings's testimony. It expressed this ruling to the jury during Pennings's testimony, as follows:

> "The defendant refused to answer one or more material questions during his testimony yesterday. I'm going to do two things. One, I'm reminding you that opening statement is not evidence, and the jury may not consider either counsel's opening statement in your deliberations.

> "In addition, the Court has stricken all portions of the defendant's testimony that are based on information that he received from his friend whom he refused to identify. Therefore, you are not to consider that testimony for any purpose. And that includes those portions of the opening statement that relate to that."

The second of the two measures the court implemented was to include in its jury instructions a variation of CALCRIM No. 371, as follows:

> "A defendant has the absolute right not to testify or to testify in a criminal trial. If a defendant chooses to testify, the defendant must answer all material questions asked by counsel. If a defendant refuses to answer one or more material questions, the jury may take that refusal into consideration.

> "If the defendant tried to hide evidence or suppress evidence by refusing to answer a material question, that conduct may show that he was aware of his guilt. If you conclude that the defendant made such an attempt, it is up

to you to decide its meaning and importance.  However, evidence of such an attempt cannot prove guilt by itself."

The jury acquitted Pennings on the counts of kidnapping, carjacking, and kidnapping during a carjacking.  But, it convicted him of false imprisonment (a lesser included offense of kidnapping), as well as of unlawfully taking a vehicle and receiving a stolen vehicle.

Pennings timely appealed.

## II.
## Discussion

The sole issue on appeal is whether the court abused its discretion in striking portions of Pennings testimony.  (See *People v. Reynolds* (1984) 152 Cal.App.3d 42, 47 (*Reynolds*) [exclusion of a criminal defendant's testimony is reviewed for an abuse of discretion].)

In probing this issue, we begin with the premise that a "defendant is entitled to a fair opportunity to defend against the state's accusations" and that this opportunity "includes the right to give testimony on his own behalf at trial."  (*People v. Lena* (2017) 8 Cal.App.5th 1145, 1149 (*Lena*); see also *People v. Brooks* (2017) 3 Cal.5th 1, 30 (*Brooks*).)  But this right does not exist in a vacuum.  Hence it is well understood that, " '[when] a defendant voluntarily testifies in his own defense[,] the People may "fully amplify his testimony by inquiring into the facts and circumstances surrounding his assertions, or by introducing evidence through cross-examination which explains or refutes his statements or the inferences which may necessarily be drawn from them.' "  (*Reynolds, supra,* 152 Cal.App.3d at p. 46; see also *Brooks,* at p. 30; *Lena,* at p. 1149.)  Simply stated, the defendant cannot have it both ways.  He "does not have the right to present facts favorable to his case without subjecting himself to cross-examination on those facts."  (*Lena,* at p. 1149.)

In a situation in which a defendant refuses to answer questions on cross-examination, a trial court exercising its discretion may respond in a variety of ways. (*Lena, supra*, 8 Cal.App.5th at pp. 1149–1150; *Reynolds, supra,* 152 Cal.App.3d at pp. 47–48.) One option is to strike the defendant's entire testimony. Recognizing, however, "that striking a defendant's entire testimony is a drastic solution, . . . less severe means are [also] to be considered." (*Reynolds,* at pp. 47–48.) Thus, "[f]or example, a partial strike is within the discretion of the trial court." (*Id.,* at p. 48.) So too is an instruction "that the defendant's failure to respond to cross-examination may be considered by the jury in evaluating his or her credibility." (*Ibid*.) In selecting among such options, the " ' "degree[ ] of strictness" ' " to apply is a matter that " ' "should be left to the determination of the trial judge, regard being had chiefly to the motive of the witness and the materiality of the answer." ' " (*Lena,* at p. 1149.)

A case that well illustrates these principles is *Reynolds.* That case involved a charge of attempted escape after a pile of sheets that had been tied together was discovered on the ground below the exterior window of defendant Reynold's jail cell. Reynolds testified that he had not been trying to escape but instead had been attempting "to smuggle drugs into the jail after he had been pressured to do so by four other inmates who [had] threatened [him with] physical injury." (*Reynolds, supra,* 152 Cal.App.3d at p. 45.)

> "On cross-examination, defendant answered questions about his prior convictions of first degree murder and rape and about the kinds of drugs obtained. The prosecutor then asked for the names of inmates with whom the drugs were shared and defendant stated he would not give any names. The prosecutor asked for the names of inmates who told defendant to break the window and defendant refused to give them, stating, 'I'm not saying their names either for

7

the reason I'm going to prison and I will have a snitch jacket on me.' The judge ordered defendant to answer and defendant refused.

"[Later in his testimony,] defendant again refused to provide names of inmates who threatened him, stating, 'If I told you who they were, I would be retaliated upon.'" (*Reynolds, supra,* 152 Cal.App.3d at p. 45.)

Citing the hindrance this posed to effective cross-examination, the trial court struck the entirety of Reynolds's testimony. (*Reynolds, supra,* 152 Cal.App.3d at p. 45; see also *Lena, supra,* 8 Cal.App.5th at p. 1150 [discussing *Reynolds*].) Reviewing this ruling, the court of appeal stated that, "[u]nder the circumstances of this case, we cannot find that the trial court's ruling was an abuse of discretion." (*Reynolds,* at p. 47.) Elaborating on this conclusion, the court explained that:

"Defendant's testimony described a group endeavor to smuggle drugs into the jail. Defendant was only one member of the group; permitting defendant's refusal to name the others would have allowed him to severely limit the prosecution's right to effective cross-examination. The prosecution would have been denied the opportunity to locate the others, in order to confirm or refute the group's activities. [Citation.] In this case, any partial striking of defendant's testimony which would still allow effective cross-examination would be extremely difficult, if not impossible." (*Reynolds, supra,* 152 Cal.App.3d at p. 47.)

On this basis, the court of appeal affirmed the trial court's order striking the entirety of Reynolds's testimony.

In the present case, as in *Reynolds*, the defendant answered most of the questions posed, refused to answer only questions about the identity of an individual allegedly involved in the activities for which he was on trial, and cited safety concerns as his basis for refusing to answer that small number of

8

questions. But, also as in *Reynolds*, the court found that the answers to the questions that the defendant refused to answer were material.

We cannot disagree with this assessment, and thus cannot view it as an abuse of discretion, because the existence of what the court described as "some type of a car deal" was the fulcrum on which Pennings's defense of a lack of criminal intent turned, and the foundation on which that fulcrum rested was the purported statements made by the friend who Pennings refused to identify. Had the jury been permitted to consider the portions of Pennings's testimony that were premised on information he said he had received from the friend he refused to identify, that "would have allowed [Pennings] to severely limit the prosecution's right to effective cross-examination" (*Reynolds, supra,* 152 Cal.App.3d at p. 47) inasmuch as "[t]he prosecution would have been denied the opportunity to locate the [friend], in order to confirm or refute" the asserted defense." (*Ibid.*)[2]

---

[2] In an effort to distinguish *Reynolds*, Pennings likens the circumstances of the present case to those of a case from the Ninth Circuit, *United States v. Negrete-Gonzales* (9th Cir. 1992) 966 F.2d 1277 (*Negrete-Gonzales*), in which three codefendants were accused of attempting to sell cocaine to an undercover agent. (*Id.,* at p. 1279.) One of the codefendants in that case (Medina) pleaded guilty and testified at trial on behalf of the other two defendants. (*Ibid.*)

> "On cross-examination, the government asked [Medina] to identify her source of cocaine. She refused. She said that to do so would jeopardize the lives of her children. She would say only that neither [of the other defendants] provided her the drugs. Based on her refusal to name her source, the [trial] court granted the government's motion to strike her entire testimony." (*Negrete-Gonzales, supra,* 966 F.2d at p. 1280.)

On appeal, the Ninth Circuit concluded that the identity of the source was "only peripherally related to Medina's direct testimony" and, on this

9

We note also that, although the motive of the defendant in refusing to answer and the materiality of the withheld answers in the present case are similar to those in *Reynolds*,  the measure challenged in the present case (i.e., the striking of only relevant portions of Pennings's testimony) is far less severe than that upheld in *Reynolds* (i.e., the striking of *all* of Reynolds's testimony).

Under these circumstances, we cannot say the trial court abused its discretion.

### III.
### Disposition

The judgment is affirmed.


KELETY, J.

WE CONCUR:


DATO, Acting P. J.


BUCHANAN, J.

---

basis, it held that the order striking her entire testimony constituted prejudicial error.  (*Negrete-Gonzales, supra,* 966 F.2d at p. 1280.)  But *Negrete-Gonzales* is distinguishable from the present case in that, whereas the individual whose identity was sought in *Negrete-Gonzales* was of only marginal relevance in that case, the individual whose identity was sought in the present case was a witness whose testimony could confirm or refute the defendant's defense.